**OFFICE OF the PEOPLE'S COUNSEL OF the DISTRICT OF COLUMBIA,** Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA,** Respondent,

The Chesapeake and Potomac Telephone Co., Intervenor.

No. 89–598.

District of Columbia Court of Appeals.

Argued Sept. 13, 1989.

Decided March 8, 1990.

Matthew S. Watson, of counsel, with whom Frederick D. Dorsey, People's Counsel, Elizabeth A. Noel, Deputy People's Counsel, Louis A. Wilmot, Associate People's Counsel, L. Marie Guillory, Associate People's Counsel, Washington, D.C., and Sandra Mattavous–Frye, Asst. People's Counsel, were on the brief, for petitioner.

Howard C. Davenport, Gen. Counsel, with whom Mary J. Sisak, Staff Counsel, Peter Wolfe, Staff Counsel, and James L. Winston, Washington, D.C., of counsel, were on the brief, for respondent.

Lee A. Satterfield, Washington, D.C., with whom Thomas L. Welch and Mark J. Mathis, of counsel, were on the brief, for intervenor.

Before FERREN, BELSON, and SCHWELB, Associate Judges.

BELSON, Associate Judge:

This appeal calls into question the method the Public Service Commission (PSC) has approved to enable the Chesapeake & Potomac Telephone Company (C & P), a regulated utility, to compete with unregulated competitors for the business of supplying internal telecommunications services to such customers as the United States Senate, the General Services Administration (GSA), and the District of Columbia Government. Petitioner, Office of the People's Counsel (OPC), seeks review of a final order and a denial of reconsideration by respondent PSC in its Formal Case No. 828. C & P has intervened in support of the orders. The orders at issue in this case were intended to resolve a dispute as to how PSC should implement Order No. 8756,[1] which authorized C & P to file individual case basis (ICB) tariffs for Centrex customers with PSC, and Order No. 8871,[2] which approved the use of the ICB Cost Manual in ICB tariff filings. In PSC Order No. 9167 (Dec. 13, 1988), the Commission for the first time declared the proper procedure for such ICB tariff filings. It decided that ICB tariffs would be filed as compliance filings under 15 D.C.M.R. § 296 (Amendment No. 1, Feb. 13, 1987, 34 D.C. Reg. 1155) instead of being filed in formal

notice and comment proceedings of D.C. Code § 43–601(d) (1986 Repl.). OPC sought reconsideration of PSC's decision in Order No. 9167 which was denied on April 11, 1989, in Order No. 9267. OPC has petitioned this court for review. For the reasons stated below, we affirm.

I.

The proceedings leading up to the orders under review in this appeal have gone on for several years. We will highlight the portions of the extensive administrative proceedings we consider pertinent to the issues raised in this appeal. In response to C & P's proposed changes to Centrex[3] service tariffs to provide the company regulatory flexibility to compete more effectively for Centrex contracts in August 1984, PSC initiated Formal Case No. 828. Order No. 8756, at 2, 8 D.C.P.S.C. at 199. During Phase II of Formal Case No. 828, the parties engaged in extensive discovery and filed written direct and rebuttal testimony, after which PSC held public evidentiary hearings. Order No. 8756, at 9, 8 D.C.P.S.C. at 204. These proceedings culminated in Final Order No. 8756 in which PSC authorized C & P to file ICB tariffs provided that C & P shareholders extend their commitment to absorb any revenue shortfall due to the ICB tariffs. Order No. 9167, at 1 and 5; Order No. 8756, at 76, 8 D.C.P.S.C. at 245. In addition, Order No. 8756 authorized a working group to develop an ICB cost manual to assist PSC with the ICB tariff filings. Order No. 9167, at 1. No particular ICB tariff filing procedure was designated at that time. *See* Order No. 9167, at 7. After C & P and PSC, with OPC's participation, developed the ICB Cost Manual, PSC approved it in Order No. 8871. Order No. 9167, at 6.

---

1. PSC Order No. 8756, Formal Case No. 828, Phase II, 8 D.C.P.S.C. 198 (May 20, 1987) [hereinafter Order No. 8756].

2. PSC Order No. 8871, Formal Case No. 828, Phase II, 8 D.C.P.S.C. 428, 87 P.U.R.4th 16 (Oct. 8, 1987) [hereinafter Order No. 8871].

3. As explained by C & P in its brief, "Centrex is a telecommunications service which permits business customers to make both internal calls

(usually by dialing four digits) and external calls. Centrex service is subject to intense competition from switches (private branch exchanges or PBXs) sold by numerous vendors in the District." C & P brief at 3. ICB customers are large entities—"a typical ICB customer has a system with 1000 or more Centrex lines." Order No. 9267, at 5 n. 4. C & P's competitors for this business are not regulated.

For the ICB tariff filings by C & P that followed, there were no clear filing procedures in place. (U.S. Senate, GSA and D.C. Government). *See* Order No. 9167, at 7. In response to PSC Order No. 9089 (Aug. 9, 1988) requesting additional information as required by the ICB Cost Manual for C & P's Senate ICB tariff filing, OPC filed an application for reconsideration and clarification arguing that notice and comment procedures for ICB tariff filings were required. PSC denied OPC's application in Order No. 9167 and, in addition, took the opportunity in Order No. 9167 to set future procedural guidelines for ICB tariff filings. After a denial of reconsideration of this order, this appeal followed.

## II.

█ C & P broadly argues that this court lacks jurisdiction because OPC waited too long to attack the series of PSC decisions that culminated in the orders before us. At oral argument, PSC joined in C & P's position. This court has jurisdiction over the portion of OPC's appeal that challenges PSC's decision in Order No. 9167 to permit C & P to file all future ICB tariffs under PSC's § 296 compliance procedure instead of complying with notice and comment rate-making procedures. OPC has appealed PSC Order No. 9267, which denied OPC's motion for reconsideration of PSC Order No. 9167, which in turn was the denial of a motion for reconsideration of PSC Order No. 9089.

PSC definitively stated for the first time in Order No. 9167 that it would use the § 296 procedure for future ICB tariff filings. Order No. 9167, at 7.[4] OPC then sought reconsideration of Order No. 9167 by the Commission as it is required by

statute to do before it can petition this court to review an action of the Commission. D.C.Code § 43–904 (1986 Repl.). The order resulting from this request for reconsideration is Order No. 9267. A petition for review of PSC's denial of this challenge was timely filed with this court. *See id.*

Although OPC, in seeking reconsideration of Order No. 9167, did not specifically argue that PSC improperly permitted C & P to guarantee that any losses from the ICB tariffs would be covered by C & P's shareholders, it does not make sense to sever that feature from the mosaic that Order No. 9167 completed. This arrangement whereby non-Centrex rate payers would, in effect, be held harmless by C & P shareholders for any loss of revenue due to any below-cost ICB tariffs was requested by PSC and became a permanent feature of ICB tariff filings by virtue of PSC's Final Order No. 8756.[5] Order No. 9167, at 5. This guarantee from C & P serves to protect the non-Centrex rate-paying public, a protection PSC deems important. *Id.* (PSC "made clear when we first sought such a commitment from C & P, that this commitment would allow the Commission to provide prompt regulatory action on C & P's ICB tariff filings."). For obvious reasons, C & P would prefer that we consider the guarantee if we take jurisdiction of the merits issues. Because this shareholder guarantee was one of the central reasons PSC decided to permit the expedited compliance review mechanism that is the subject of this appeal, it is proper to consider it in our decision.

## III.

█ "The scope of this court's review of PSC decisions 'is the narrowest judicial re-

---

4. Order No. 9167 states in part: "OPC has been on notice throughout this proceeding that the Commission *would* develop procedures to allow expedited review of the ICB tariffs. *Now* that we have completed review of the first ICB tariff and have three additional ICB tariffs on file, we are able to specify the procedures we will use. Those procedures are the compliance filing procedures of Section 296 of our rules." *Id.* (emphasis added). PSC also noted that C & P had been confused about which procedure to use for its ICB tariff filings. *Id.*

5. PSC required C & P to guarantee that C & P's shareholders, rather than non-Centrex ratepayers, would absorb any losses suffered by C & P as a result of C & P's individual ICB contracts. As PSC acknowledged at oral argument, this arrangement would prohibit C & P from seeking consideration of any Centrex losses incurred by C & P at future general rate-making proceedings.

view in the field of administrative law.'" *OPC v. PSC*, 482 A.2d 404, 407 (D.C.1984) (quoting *Potomac Electric Power Co. v. PSC*, 402 A.2d 14, 17 (D.C.) (en banc), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979)). Judicial review of PSC orders or decisions is limited essentially to questions of law, including constitutional questions. D.C.Code § 43–906 (1986 Repl.). "[F]indings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." *Id.* "Our function is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations." *Atlantic Telephone Co. v. PSC*, 390 A.2d 439, 441 (D.C.1978) (quoting *Williams v. Washington Metropolitan Area Transit Commission*, 134 U.S.App. D.C. 342, 362, 415 F.2d 922, 942 (1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969)).

"'[I]t is especially important to accord great respect to the Commission in a complex, esoteric area such as rate making in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies.'" *OPC v. PSC*, 455 A.2d 391, 393 (D.C.1982) (quoting *Goodman v. Public Service Commission*, 162 U.S.App.D.C. 74, 78–79, 497 F.2d 661, 665–66 (1974) (footnote and citation omitted)). Moreover,

> [i]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry … is at an end. The fact that the method employed to reach that result

may contain infirmities is not then important.

*OPC v. PSC*, 472 A.2d 860, 862–63 (D.C. 1984) (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (footnote and citation omitted)).

 PSC must provide a "full and careful explanation" of its ruling in order for this court to accord it "great deference." *Washington Gas Light Co. v. PSC*, 452 A.2d 375, 379 (D.C.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983). In order for a party to overcome the presumption of validity that attaches to fully reasoned PSC orders, the party must clearly and convincingly show a fatal flaw in PSC's decision. *Goodman v. PSC*, 309 A.2d 97, 101 (D.C.1973); *see also OPC v. PSC, supra*, 472 A.2d at 863; *OPC v. PSC*, 462 A.2d 1105, 1109 (D.C.1983).

 The question of law before this court is whether PSC mistakenly interpreted its statutory power to regulate public utilities to authorize it to permit C & P to file ICB tariffs in compliance with the PSC-approved rate design cost manual,[6] rather than to mandate that it require C & P to establish its entitlement to a particular rate which PSC then approves by order. PSC has taken a broad view of its power to loosen regulatory restraints upon C & P in connection with the services it supplies its custom Centrex customers at a time when C & P is faced with unprecedented challenges from unregulated competitors for contracts to provide such services. While PSC's efforts to modernize its approach to regulating C & P's ICB tariffs doubtless are intended to be fair to C & P and the rate-paying public as well, it is our task to ensure that PSC's actions comport with a statute that was enacted before competition for PBX service contracts was contemplated.

---

**6.** On October 8, 1987, PSC approved the ICB Cost Manual that PSC and C & P had developed, a process in which OPC participated. Order No. 8871. The ICB Cost Manual provides PSC with a standardized format and rate design with which C & P must comply when filing its ICB rates. This manual is structured to assist PSC's review of ICB filings to ensure that the rates comport with both the manual and Order No. 8756. Compliance with the manual is also de-

signed to ensure that the ICB rates filed by PSC do not fall below C & P's costs. The ICB Cost Manual is thus functionally equivalent to early stages of rate making. Because ICB tariff filings must be tailored to the ICB Cost Manual, the resulting rates should be high enough to prevent the creation of any financial burden which could later be passed on to C & P's regular customers.

Under D.C.Code § 43–601 (1986 Repl.), a public utility must file a rate change application with PSC when it seeks to deviate from a preexisting rate order. This statute provides that:

> [u]pon receiving such application the Commission shall fix a time and place for hearing, and give such notice to interested parties as shall be proper and reasonable; if, after such hearing and investigation, the Commission shall find that the change or discontinuance applied for is reasonable, fair, and just, it shall grant the application, either in whole or in part.

§ 43–601(d). It is this provision, OPC argues, that PSC is violating by allowing C & P to use a different procedure, a compliance filing system, for its ICB tariffs.

The compliance procedure of 15 D.C.M.R. § 296 that PSC has designated for C & P's future ICB tariff filings in Order No. 9167 requires that "[c]ompliance filings affecting existing rates shall be filed with the Secretary of the Commission, the [OPC], and each intervenor." § 296.1. The parties receiving notice of the compliance filing may submit comments within five days of the compliance filing. § 296.3. This five-day comment period may not be enlarged absent "a clear showing of extraordinary circumstances." § 296.4. While these compliance filings provide OPC and others with the opportunity to comment on a tariff filing, PSC is not required to take any specific action in response to the filing or comments. Indeed, under this procedure PSC neither approves nor disapproves the filing; instead the newly filed rate takes effect automatically. If the Commission, however, on reviewing the compliance filing concludes that the rate is too low, the general ratepayers will not be required to make up the resulting loss at the next general ratemaking proceeding. Order No. 8756, at 76, 8 D.C.P.S.C. at 245. Instead, C & P shareholders will absorb such losses. Moreover, if PSC is of the view that there has been an abuse of the compliance filing system, it can take steps to put an end to the system which C & P can use as a result of these proceedings. *See* D.C.Code § 43–902 (1986 Repl.).

PSC generally has a broad mandate to interpret its authorizing legislation liberally, and to implement reasonable and necessary regulations, drawing upon its particular expertise in public utilities. D.C.Code § 43–103 (1986 Repl.)[7]; *see also OPC v. PSC, supra,* 472 A.2d at 866 (automatic fuel adjustment clauses for PEPCO are proper); *OPC v. PSC, supra,* 482 A.2d 404 at 412 (utility permitted to vary its rate for interruptible customers on a monthly basis). *Compare C & P v. PSC,* 378 A.2d 1085, 1089 (D.C.1977) (PSC properly denied C & P the right to file a rate for "new" PBX service where C & P already provided PBX service and was seeking, in effect, to change existing rates without obtaining formal PSC approval). Because there is nothing in the statute specifically authorizing use of the compliance procedure for ICB tariff filings, the question becomes whether the statute gives PSC the implied power to employ that procedure for such filings. *See* D.C.Code § 43–103. As we will explain, PSC takes the view that there is nothing in § 43–601 that explicitly requires the filing of ICB tariffs, pursuant to a prior PSC order (here Nos. 8756 and 8871), to follow the § 43–601(d) procedure.

PSC has determined that the abbreviated comment procedure under § 296 is adequate, considering that the ICB tariffs are

---

7. Section 43–103 provides, in pertinent part, that:

[t]he provisions of Chapters 1–10 of this title shall be interpreted and construed liberally in order to accomplish the purposes thereof, and where any specific power or authority is given the Commission by the provisions of Chapters 1–10 of this title the enumeration thereof shall not be held to exclude or impair any power or authority otherwise in Chapters 1–10 of this title conferred on said Commission. The Commission hereby created shall have, in addition to the powers in Chapters 1–10 of this title specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned and indicated. A substantial compliance with the requirements of Chapters 1–10 of this title shall be sufficient to give effect to all the rules, orders, acts, and regulations of the Commission, and they shall not be declared inoperative, illegal, or void for any omission of a technical nature in respect thereto.

 

only individual rates for custom Centrex services which the ratepayer agrees to by contract, and that the non-Centrex ratepayer is protected by the shareholder guarantee covering any losses on this program. Given that the ICB tariff process for C & P's Centrex systems has gone through lengthy proceedings laying the groundwork for the ICB tariff filings, and that PSC provided in Order No. 9167 a reasoned basis for its use of compliance filings, we believe the statute does not require us to disturb the administrative rulings on review.

In *OPC v. PSC, supra,* 462 A.2d 1105, the court found that once PSC had entered a final rate-making order that set out the rates and the rate design, subsequent changes to that order did not need to go through the adjudicatory process, but instead, review of the change as a compliance procedure was appropriate. *Id.* at 1114. This court found that PSC had conducted adequate procedures in the rate-making process, making decisions based on substantial evidence in the record of the final rate-making proceeding. In the case before the court, PSC argues that the adoption of the ICB Cost Manual, and its decision in the final order of Phase II, serve as sufficient bases for approving actual ICB tariff filings under § 296. While we recognize that in *OPC v. PSC,* unlike here, the earlier phases of the proceedings had been focused on a particular rate design and all that was to be included in a compliance filing was the application of the terms of a final rate-making order, we also recognize that there is a substantial degree of similarity between that situation and the matter before us in which the fundamental method of ascertaining the rate had been built into the ICB Cost Manual.

We conclude that there is sufficient evidence in the record, as explained in Order No. 9167, to support PSC's decision to warrant affirmance. The ICB tariff procedure developed by PSC unfetters C & P from restraints that harm its competitive position vis-à-vis competitors that are also bidding for contracts on various PBX/Centrex phone systems. *See generally* Order No. 9167. C & P can set its proposed rate competitively, and is protected by this procedure against PSC's later coming back and ruling that the rate set by C & P is unreasonable. C & P can stand behind the prices it proposes in its bid for a Centrex ICB customer. PSC also observes that the Centrex systems account for forty percent of C & P's intradistrict revenues. In the now competitive marketplace, C & P faces the risk of losing a substantial portion of that market. PSC points out quite reasonably that such a market loss would ultimately cause severe harm to the general ratepayer.

This court will defer to PSC's expertise in rate making in this instance; we find that PSC has acted within the scope of powers implied in its authorizing legislation. The use of the ICB Cost Manual is intended to assure reasonable rates. If there should nevertheless be some revenue shortfall because C & P set Centrex rates low in order to meet competition, it would be absorbed by the shareholders of C & P, and non-Centrex ratepayers would not be harmed.[8] Considering the deferential standard of review accorded PSC in rate-making proceedings, together with substantial evidence in the record to support its findings, we affirm PSC Order No. 9267 and, by implication, Order No. 9167 as well.

*So ordered.*

---

**8.** Similarly, we agree with PSC's rejection of OPC's argument that PSC failed to protect actual and potential PBX/Centrex bidders from possible discriminatory tariff practices by C & P between ICB ratepayers. Because the ICB ratepayers are private entities engaging in arms-length transactions in the open market, the marketplace, tempered in the case of C & P bids by the application of the ICB Cost Manual, will determine the contract price offered by C & P.

No ICB rate is imposed by C & P on any ICB customer; instead, the ICB customer can agree to the rate or reject it. Given these considerations demonstrating minimal, if any, risk of discrimination between ICB ratepayers and the determination by PSC of C & P's need for flexibility in the market for Centrex services, this court will defer to PSC's decision to implement this system.