**OFFICE OF PEOPLE'S COUNSEL,**
Appellant,

v.

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA,**
Respondent,

**Potomac Electric Power Company,**
Intervenor.

No. 92–AA–79.

District of Columbia Court of Appeals.

Argued April 30, 1992.
Decided June 2, 1992.

Bonnie S. Blair, with whom Elizabeth A. Noel and Sandra Mattavous–Frye, Washington, D.C., were on the brief, for petitioner.

Daryl L. Avery, with whom Edwin E. Huddleson, III, Washington, D.C., was on the brief, for respondent.

Kirk J. Emge, with whom Paul H. Harrington, Washington, D.C., was on the brief, for intervenor.

Before FERREN, TERRY, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

Petitioner, the Office of People's Counsel (OPC), challenges two orders of the Public Service Commission (PSC or Commission) issued in Formal Case No. 905. The first, Order No. 9868, issued on October 23, 1991, granted a $19 million rate increase to the Potomac Electric Power Company (PEPCO), including $15 million reflecting costs

associated with certain power generating units located at Chalk Point, Maryland. The second, Order No. 9938, issued on January 2, 1992, denied reconsideration of the rate increase granted to PEPCO in Order No. 9868. In this expedited appeal, we review both orders and affirm.

OPC challenges on several grounds PEPCO's including in its rate base the cost of four combustion turbines (CTs), which were still under construction at Chalk Point at the time of PEPCO's application. First, OPC argues that PEPCO had constructed the CTs without obtaining prior PSC approval, as required by D.C.Code § 43–1002 (1990).[1] In this connection, OPC contends that the PSC failed to conduct a prudence review of the Chalk Point CTs and that, in the absence of such a review, PEPCO could not lawfully pass along the costs of the CTs to District ratepayers.

Second, OPC challenges the Commission's refusal to receive evidence, or to entertain argument proffered by OPC, demonstrating that the Chalk Point CTs were "Construction Work in Progress" (CWIP) during the 1990 test year. According to PSC policy and precedent, a utility may not include in its rate base the cost of construction not yet completed. OPC argues that the PSC mistakenly treated its denial of OPC's motion for summary disposition as, in addition, a summary judgment in favor of PEPCO on this issue and thereby deprived OPC of an adequate opportunity to be heard on whether the Chalk Point CTs should be classified as CWIP, requiring its exclusion from PEPCO's rate base.

Finally, OPC contends that the PSC deviated from its own ratemaking principles when it allowed PEPCO a rate increase that included cost recovery for the Chalk Point CTs, and that the Commission failed to articulate a reasoned justification for this departure from precedent. OPC adds that, assuming an out-of-period adjustment

for the Chalk Point CTs could be sustained, it should have been counterbalanced with OPC's own proposed adjustments to rate elements based on the 1990 test year. OPC argues that these unbalanced PSC departures from sound ratemaking principles "skewed the ratemaking relationships" and resulted in unjust and unreasonable rates to District ratepayers.

I. Procedural History

On December 28, 1990, PEPCO applied for a rate increase of more than $56.4 million, basing its application on test year 1990.[2] PEPCO indicated in its application that "a significant portion" of its increase was associated with its request to recover the costs related to four combustion turbines located at Chalk Point, Maryland. [Order No. 9868 at 1] The PSC held a prehearing conference on February 11, 1991, to define the issues for the Commission's review of PEPCO's application. OPC and PEPCO submitted proposed issues for consideration. On April 12, 1991, the PSC issued an Order and Report on Prehearing Conference, Order No. 9695, stating the issues to be resolved at the hearing. The Commission in that prehearing order rejected OPC's proposal that the PSC "review PEPCO's near-term construction program including energy and demand forecasts, cost estimates and prudenc[e]." [Order. No. 9695 at 11.] The Commission determined that Formal Case No. 834, Phase III, had "provided OPC and other parties a full and fair opportunity to raise and litigate the construction program matters." [Id. at 13.] The PSC agreed, however, to examine "the reasonableness of the cost and timing of PEPCO's new generation" [id.,] and, specifically, whether PEPCO's ratemaking treatment of its investment in the Chalk Point CTs was reasonable. [See id. at 18.]

---

1. D.C.Code § 43–1002, enacted in 1913, provides:

No gas corporation or electrical corporation shall begin the construction of a gas plant or electric plant without first having obtained the permission and approval of the Commission.

2. PEPCO had historical data for the first ten months of 1990. November and December were reflected in projected data. [Order No. 9868 at 3].

OPC filed a motion for summary disposition arguing that PSC precedent and policies prevented inclusion of CWIP in the rate base and disallowed out-of-period adjustments that were overly remote in time from the test period. OPC contended that PEPCO, by including the costs of Chalk Point CTs in its rate base, was attempting to recover costs of CWIP that would not be operational until six months after the end of the test period. The PSC rejected OPC's arguments, denied OPC's motion for summary disposition, and fully resolved the CWIP issue in PEPCO's favor.

In the ratemaking proceeding itself, PEPCO submitted direct testimony, as did OPC, the General Services Administration, District of Columbia Natural Gas, the government of the District of Columbia, the Apartment and Office Building Association (AOBA), Washington Metropolitan Transportation Authority, and the PSC staff. OPC submitted rebuttal testimony, as did every other party except AOBA. Four more days of evidentiary hearings were held to allow for cross-examination. [Order No. 9868 at 1–2] The final result was a 388 page order outlining the evidence, granting a $19 million (out of a requested $56.4 million) rate increase, and explaining the Commission's decision.

## II. Scope of Review

■ The scope of our review of PSC decisions " 'is the narrowest judicial review in the field of administrative law.' " *Office of People's Counsel v. Public Serv. Comm'n*, 571 A.2d 206, 208–09 (D.C.1990) (quoting *Office of People's Counsel v. Public Serv. Comm'n*, 482 A.2d 404, 407 (D.C. 1984) (quoting *Potomac Electric Power Co. v. Public Serv. Comm'n*, 402 A.2d 14, 17 (D.C.) (en banc), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979))); *accord Washington Gas Light Co. v. Public Serv. Comm'n*, 450 A.2d 1187, 1193 (D.C.1982). Our review is limited by statute to questions of law, and the Commission's findings of fact are conclusive unless those findings are unreasonable, arbitrary, or capricious. D.C.Code § 43–906 (1990). This court's review function " 'is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations.' " *OPC v. PSC*, 571 A.2d at 209 (quoting *Atlantic Tel. Co. v. Public Serv. Comm'n*, 390 A.2d 439, 441 (D.C. 1978)); *accord Williams v. Washington Metropolitan Area Transit Commission*, 134 U.S.App. D.C. 342, 362, 415 F.2d 922, 942 (1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

"[I]t is especially important to accord great respect to the Commission in a complex, esoteric area such as ratemaking in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies." *OPC v. PSC*, 571 A.2d at 209 (quotations omitted); *accord Office of People's Counsel v. Public Service Comm'n*, 455 A.2d 391, 393 (D.C.1982); *OPC v. PSC*, 482 A.2d at 407; *Goodman v. Public Service Comm'n*, 162 U.S.App. D.C. 74, 78–79, 497 F.2d 661, 665–66 (1974). " 'It is the Commission, not this court, that must balance the competing interests of utility consumers and investors in the ratemaking process.' " *OPC v. PSC*, 482 A.2d at 407 (quoting *OPC v. PSC*, 455 A.2d at 393). Because theories of ratemaking in particular "fall within the special province" of the PSC, such theories are not "subject to the same substantiation principle applicable to fact-finding." *Id.* (quoting *Washington Gas Light*, 450 A.2d at 1193).

■ Finally, it is not the theory "but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, our inquiry" is finished. *OPC v. PSC*, 571 A.2d at 209 (citing *Office of People's Counsel v. Public Service Comm'n*, 472 A.2d 860, 862 (D.C.1984). Of course, the PSC must fully and carefully explain its ruling. *Id.* However, "[i]n order for a party to overcome the presumption of validity that attaches to fully reasoned PSC orders, the party must clearly and convincingly show a fatal flaw in PSC's decision." *Id.* (citing *Goodman v. Public Serv. Comm'n*, 309 A.2d 97, 101 (D.C.1973).

### III. The Merits
### A.

■ In general, this court defers to an agency's construction of a statute it is charged with administering, so long as that construction enhances the general purposes and policies underlying the statute. *Office of People's Counsel v. Public Service Comm'n,* 572 A.2d 410, 413 (D.C.1990). Before the Commission, OPC repeatedly argued its position that the construction of the Chalk Point CTs had been undertaken without prior PSC approval under D.C.Code § 43–1002, and that PEPCO's failure to satisfy the statutory requirements precluded its recovery of the costs of Chalk Point construction through a rate increase. The PSC repeatedly rejected OPC's statutory argument, concluding that the prudence review undertaken in Formal Case No. 834 was sufficient to satisfy the spirit of D.C.Code § 43–1002, if indeed the statute was applicable in this situation—a questionable proposition since the Chalk Point CTs are located not in the District but in Maryland. The Commission stated:

> OPC's motion fails to make any credible showing that D.C.Code Section 43–1002 is applicable to the Maryland generation units in a manner which would be decisionally significant in this rate case.

[Order No. 9751 at 8.] The Commission also hinted that OPC had waived any objection based on D.C.Code § 43–1002 because OPC had "waited until the generating units were almost completed prior to raising the argument that preconstruction review was necessary." [Order No. 9938 at 8]

■ We need not decide whether D.C.Code § 43–1002 applies to new construction outside the District of Columbia or whether OPC waived any argument based on the statute by waiting until the units were virtually completed before raising it. Given the PSC's thorough examination of the reasonableness of PEPCO's construction of the Chalk Point CTs in Formal Case No. 834, as well as the Commission's examination of the reasonableness of PEPCO's cost recovery for the CTs in Formal Case No. 905, we are satisfied that the Commission's apparent acquiescence in PEPCO's failure to obtain PSC approval in advance of construction of the CTs, even if such approval was statutorily required, did not rise to the level of prejudicial error.[3] *See* D.C.Code § 1–1510(b) (1987) (in review of agency decision, court may invoke rule of prejudicial error); *see also K.G.S., Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 531 A.2d 1001, 1005 (D.C. 1987) (admission of improper testimony, though erroneous, not sufficient to require reversal).

■ We turn to OPC's related assertion that the costs associated with the Chalk Point CTs were improperly included in PEPCO's rate base because the PSC had failed to conduct a prudence review of the CTs. The Commission does not dispute the necessity for a prudence review. *See Atlantic Tel.,* 390 A.2d at 443 (utility must show that expenditures relied upon as basis for proposed rate increase are themselves reasonable). The Commission asserts, however, that it did perform such a review in Formal Case No. 834. The record strongly supports the Commission's position. In Formal Case No. 834, Order No. 9714, the PSC formally acknowledged that PEPCO's four-year action plan included the CTs at Chalk Point.

> Witness Gee indicates that on the supply side the Company [PEPCO] plans to employ all existing generating facilities as well as the following: (i) [four] combustion turbines at Chalk Point. . . . [as part of its four-year action plan]

---

3. We also note that Formal Case No. 873, a rulemaking proceeding regarding power plant construction regulations, is currently pending. [Order No. 9938 at 8] We trust that the resulting regulations will clarify the steps necessary to satisfy D.C.Code § 43–1002. In the meantime, we defer to the Commission's interpretation of the statute on these facts, where it is obvious that prior approval of the Chalk Point CTs would have been granted if sought. We further note, without ascribing any particular legal significance to it for the District of Columbia, that PEPCO obtained a Certificate of Public Convenience and Necessity from the State of Maryland before it commenced construction of the Chalk Point units. [Formal Case No. 834, Order No. 9714 at 110]

Formal Case No. 834, Order No. 9714 at 110. The Commission concluded that "PEPCO's evaluation of the supply-side expansion plans [is] reasonable," *id.* at 95, and, further, that "PEPCO's four-year action plan is reasonable." *Id.* at 120.

OPC participated fully in Formal Case No. 834; it did not appeal the PSC's decision in Order No. 9714. Keeping in mind the limited nature of our review, we conclude that the record supports the Commission's assertion that the prudence review of the Chalk Point CTs occurred in the context of Formal Case No. 834. We further conclude that OPC has failed to demonstrate clearly and convincingly that the PSC's interpretation is fatally defective. *See OPC v. PSC,* 571 A.2d at 209. Moreover, the Commission's established policy prohibits it from undertaking a prudence review in the context of a rate case, because to do so would overwhelm the rate-making proceeding, rendering the process unwieldy and inefficient. *See* Formal Case No. 905, Order No. 9751 at 6. Furthermore, this court has approved the Commission's bifurcated approach, allowing for a two-step review of new utility construction. *See OPC v. PSC,* 482 A.2d at 416 (recognizing Commission's procedure of reviewing gas company's construction budget in initial proceeding and cost recovery in future proceeding). The PSC concluded that in this case OPC had failed to show any compelling reason for the PSC to disregard the Commission's policy of separating prudence reviews from ratemaking. *See id.* We see no reason to disturb the Commission's conclusion.

### B.

■ OPC next argues that, by striking OPC's evidence that the Chalk Point CTs were "construction work in progress" that should be excluded from the rate base, the PSC deprived OPC of an opportunity to be heard on that issue.[4] We disagree. An examination of the record reveals that OPC had many opportunities to present its argument on the CWIP issue to the Commission.

OPC first presented its CWIP argument in the form of a proposed issue supplied in advance of the prehearing conference. Like a pretrial conference in an ordinary civil case, a PSC prehearing conference serves to narrow and define the issues. "The Commission questioned all the parties on their comments, views and suggestions regarding the conduct of [the hearing] at the Prehearing Conference on February 11, 1991." Formal Case No. 905, Order No. 9695 at 1. Both OPC and PEPCO submitted proposed issues to the Commission. One of OPC's proposed issues was:

> Should post December 31, 1990 non-pollution control construction work in progress costs associated with the four combustion turbines at Chalk Point ... be included in rate base?

Although the Commission accepted as appropriate most of OPC's thirty-five proposed issues, it concluded that some, including the proposed issue concerning CWIP costs, had to be "recast or rejected." Order No. 9695 at 11. The Commission determined that, because the CWIP issue would be addressed in OPC's motion for summary disposition, *id.* at 13, it would not be necessary to address OPC's proposed CWIP issue at the ratemaking hearing. The Commission therefore recast the CWIP question into the following:

> 4. Is PEPCO's ratemaking treatment of its investment in the four Chalk Point CTs reasonable?
>
> 5. Are PEPCO's Step 2 cost of service adjustments lawful and reasonable?

Order No. 9695 at 18.

OPC's motion for summary disposition gave the Commission a second—this time full—opportunity to hear and consider OPC's position on whether the Chalk Point

---

4. OPC argues that the Commission improperly equated its denial of OPC's motion for summary disposition with a grant of summary disposition in favor of PEPCO. A careful examination of Order No. 9708 denying OPC's motion reveals the Commission concluded that, because OPC's reasoning was not sound, the Commission need not consider whether the Chalk Point units were construction work in progress. In effect, therefore, the Commission's decision on OPC's motion resolved the issue in PEPCO's favor.

costs were related to CWIP that should be excluded from PEPCO's rate base. OPC's motion pointed out that the PSC's policies and precedent did not allow inclusion of CWIP in the rate base and, further, did not allow post-test-period adjustments that were overly remote in time from the test year. [Order No. 9708 at 2.] OPC contended that PEPCO's inclusion of the Chalk Point costs constituted an attempt impermissibly to recover costs for CWIP. [*Id.*] OPC further argued that because the CTs were not yet operational, there could be no certainty about the in-service date and, therefore, that the costs were too remote to be included in the test year. [*Id.* at 3.] PEPCO replied that the costs of the Chalk Point CTs were known, certain, and not remote, and that the CTs would certainly be in operation before the applicable rate increase went into effect.

The Commission ruled:

We conclude that OPC's argument that PEPCO is attempting to include CWIP in rate base contrary to our policy is not sound. While it is clear that our precedent does not permit non-pollution control CWIP in the rate base, here PEPCO is seeking to recover its plant costs beginning at a time when the plants are to be in service and, therefore, used and useful. In contrast, CWIP [would allow] the recovery of plant construction costs to take place prior to the plant's going on line.

Here PEPCO seeks to recover through its rates the investment in the 5 CTs after the units come on stream. Thus, PEPCO is not requesting that customers who would not benefit from these new generating facilities pay for their costs. PEPCO's proposal does not violate our policy regarding the exclusion of non-pollution control CWIP in the rate base. Nor does it violate the primary consideration underlying the disallowance of CWIP: that the consumer should not have to begin to pay a cash return on construction until the generating unit is in service.

[Formal Case No. 905, Order. No. 9708 at 7 (internal quotations and footnote omitted).]

OPC moved for reconsideration of the Commission's unfavorable evidentiary ruling. Again the Commission considered the evidence and rejected it as legally irrelevant. This was the third time OPC made the CWIP argument to the Commission.

We are not concerned at this point with the soundness of OPC's argument on the CWIP issue. Rather, the question is whether OPC had an opportunity to be heard on that point. The careful treatment of the CWIP issue in Order No. 9708 demonstrates clearly that the Commission heard and understood OPC's argument but rejected it, deciding instead that PEPCO was entitled to include the Chalk Point costs in its rate base. We are fully satisfied that OPC was not deprived of an opportunity to be heard.

### C.

■ OPC argues, finally, that the PSC violated its own policies and precedents by allowing PEPCO to include the costs of the Chalk Point CTs in the rate base and by failing to balance this out-of-period adjustment with counter-adjustments that OPC had proposed. OPC contends that the Chalk Point costs "skewed the ratemaking relationships," contravened sound ratemaking principles, and resulted in unjust and unreasonable rates for District ratepayers. OPC further asserts that the Commission failed rationally to explain its departure from its own policy and precedent.

OPC concedes that some deviation from the historical test year is permissible. It acknowledges, for example, that "up to six months of costs may be projected, and adjustments may be made in limited circumstances *for additional costs that did not exist in the test year.*" OPC Brief at 28 (emphasis added). Moreover, according to OPC, a utility may seek Commission approval for out-of-period adjustments for expenses that are known and measurable or can be projected with reasonable accuracy. OPC Brief at 29. OPC argues, however, that, assuming PEPCO could include Chalk Point costs, the Commission should have balanced them with the compensating adjustments OPC proposed.

The Commission replies by citing, from its own cases, instances in which out-of-period adjustments have been allowed because those adjustments would serve to "make the test period more accurately representative of the future conditions for which the rates are being set." *C & P Telephone*, Formal Case No. 729, Order No. 7323 (1981). Out-of-period adjustments are also allowed when the adjustments account for "known and definite changes that can be calculated with precision." *C & P Telephone*, Formal Case No. 798, Order No. 7886. Moreover, this court reversed the Commission's denial of an out-of-period adjustment in *Washington Gas Light Co. v. Public Serv. Comm'n*, 452 A.2d 375 (D.C.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983), because we concluded that the Commission had unreasonably refused to allow the Company's rate of return to reflect known and measurable costs associated with an issuance of stock. *See id.* at 382–83. We are satisfied that these cases, both from the PSC and from this court, provide ample precedent for allowing out-of-period adjustments when known and definite deviations from the test year can be calculated with precision.

█ In addition, the burden of justifying an out-of-period adjustment is on the party seeking the adjustment. Here, the Commission concluded that PEPCO had met its burden while OPC had not. The PSC accordingly allowed the Chalk Point adjustment while denying OPC's allegedly countervailing adjustments. *See PEPCO*, Formal Case No. 685, Order No. 6096 (accepting PEPCO's post-test-year adjustment for wage increases, rejecting OPC's proposed counter-adjustment for projected increased sales of electricity). The PSC has demonstrated that it did not violate its policy, and we see no reason to disturb the PSC's conclusion.

█ The Commission may not depart from its own established policy without providing a reasoned explanation for doing so. *See Panhandle E. Pipe Line Co. v. FERC*, 281 U.S.App.D.C. 318, 322–323, 890 F.2d 435, 439–440 (1989). In the event that an agency departs from its own policy, it must supply a reasoned analysis indicating that "'prior policies and standards are being deliberately changed, not casually ignored.'" *OPC v. PSC*, 455 A.2d at 396 (quoting *Greater Boston Tel. Corp. v. FCC*, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). Even if we had concluded that the PSC deviated from its own policy and precedent in this case when it allowed PEPCO's out-of-period adjustment for the Chalk Point CTs, it is clear that the Commission provided several explanations for allowing the out-of-period adjustments to reflect the costs of the Chalk Point CTs and for rejecting OPC's proposed adjustments: (1) The Chalk Point CTs will provide benefits to District ratepayers for the entire rate-effective period. *See* Order No. 9868 at 42; Order No. 9938 at 9 n. 6. (2) The Chalk Point CTs significantly improved PEPCO's ability to provide safe, reasonable, and reliable service to customers during the rate-effective period by raising PEPCO's reserve margin to an appropriate level. *See* Order No. 9938 at 9 n. 6. (3) The allowed out-of-period adjustment enables PEPCO's rates to reflect the accurate cost of PEPCO's service to its customers. *See* Order No. 9868 at 41–43; Order No. 9938 at 9. (4) OPC failed to present sufficient evidence in support of its own proposed adjustments. *See* Order No. 9868 at 44–45; Order No. 9938 at 9–10. (5) OPC's proposed adjustment for depreciation amounted to a distortion of the conditions that would exist during the rate-effective period. (Order No. 9868 at 43).

We are satisfied that the Commission's decision to allow an out-of-period adjustment to reflect costs associated with the Chalk Point CTs was "reasonable, explained, and supported." *OPC v. PSC*, 482 A.2d at 418 (quoting *Washington Gas Light*, 450 A.2d at 1193). Moreover, we recognize "the need to defer to the 'expertise of the commissioners in the complex and esoteric are of utility regulation,' especially where '[t]heories of ratemaking' are at issue." *Id.* (quoting *Washington Gas Light*, 450 A.2d at 1193). Accordingly, we

see no reason to disturb the conclusions of the Public Service Commission.

*Affirmed.*