**OFFICE OF THE PEOPLE'S COUNSEL, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, Respondent;**

**VERIZON WASHINGTON, DC INC., Intervenor.**

No. 01–AA–572.

District of Columbia Court of Appeals.

Argued Jan. 10, 2002.

Decided May 2, 2002.

Laurence C. Daniels, Deputy People's Counsel, with whom Elizabeth A. Noël, People's Counsel, and Sandra Mattavous–Frye and Barbara L. Burton, Deputy People's Counsel, and Scott H. Strauss and David B. Lieb, were on the brief, for petitioner.

Timothy R. Robinson, General Counsel of the Public Service Commission of the District of Columbia, with whom Lara H. Walt, Staff Counsel of the Commission, was on the brief, for respondent.

Natalie O. Ludaway, Washington, DC, with whom David A. Hill was on the brief, for intervenor.

Before STEADMAN, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

In this appeal, the Office of the People's Counsel asks us to vacate a Public Service Commission order approving a tariff amendment sought by Verizon Washington, DC Inc. The amendment would expand the category of home-based business customers of Verizon who are eligible for telephone service at favorable residential rates. The Office of the People's Counsel contends that the amendment unjustly discriminates against Verizon's other business customers and argues that the Commission's approval is fatally flawed on the ground that it is not supported by substantial evidence in the record. We conclude that the decision on appeal withstands the main challenge that is levied against it, but we nonetheless vacate the Commission's order and remand the case for further consideration because the Commission based its decision in part on a misunderstanding of the record before it.

## I.

Verizon Washington, DC Inc. provides telephone service in the District of Columbia pursuant to a tariff approved by the Public Service Commission. Under that tariff, customer service may be furnished at either business or residence rates. Rates for residential customers are typically lower than rates for business customers, but business customers may choose from amongst a wider variety of service options. Only business customers may be listed in the business section of the White Pages telephone directory prepared by Verizon. According to the tariff, "[t]he determination as to whether customer service is furnished at business or residence rates is based on the location and character of use made of the service," with the proviso that "[t]he type of directory listing may, in some cases, also serve as a satisfactory basis for determining whether business or residence rates apply." More specifically, the tariff states that business rates apply "where the use is primarily or

substantially of a business, professional, institutional or occupational nature, or where a business directory listing is furnished." In contrast, the tariff provision that specifies when residence rates apply states that "[s]ervice is classified and charged for as residence service where the primary use of the service is of a domestic nature, *and where the business use, if any, is merely incidental.*" [1] (Emphasis added.)

In March 2000, Verizon asked the Public Service Commission to approve a tariff amendment deleting the italicized language from the residence service provision. Verizon stated that this amendment would "allow greater flexibility for residential customers who wish to use their service for a home-based business." The proposed change would permit Verizon to furnish telephone service to such customers at residence rates so long as their "primary use" of the service is of a "domestic nature," even if their business use of the service is more than "merely incidental." In other words, substantial use of a home telephone for business purposes would be deemed compatible with the residence service classification so long as the business use did not predominate. Theoretically, at least, home-based businesses would be able to save money by opting to pay for telephone service at residence rather than business rates. The rates charged to other users of telephone service would not be affected by the amendment (at least not directly or immediately).

The Public Service Commission issued a public notice inviting written comments on Verizon's proposed tariff amendment prior to "final rulemaking action." The Office of the People's Counsel (OPC) submitted the only comments. OPC urged the Commission to reject the tariff amendment as unjustly discriminatory because it would allow home-based businesses to be charged a lower rate for telephone service than non-home-based businesses.[2]

In reply, Verizon explained that District customers who operate small businesses from their homes would be the main beneficiaries of the proposed tariff amendment. Voicing its concededly undocumented belief that most such customers already had residential telecommunications service anyway, Verizon stated that such customers "would be able to more accurately report" their telephone usage, and Verizon, in turn, would be better able to meet their service needs. Verizon argued that "only the smallest businesses would qualify" for residential rates even if the Commission were to approve its proposed amendment because such rates would continue to be available only when the primary use of the service is of a domestic nature. Verizon argued that for this reason eligible home-based businesses were not similarly situated with other businesses, and hence the proposed amendment would not be discriminatory.

---

**1.** The tariff does provide for a few exceptions to this classification scheme. Telephone service may be furnished at residence rates "in the residence of a physician, nurse, dentist or veterinary surgeon, or in a clergyman's study located in a church," regardless of whether the primary use is domestic or occupational. These exceptions have no bearing on the present dispute.

**2.** OPC also advanced other objections to the amendment, for example that it would be anti-competitive and require bona fide residential customers to subsidize home-based commercial enterprises. OPC abandoned those other objections by not reasserting them when it applied for reconsideration of the Commission's initial decision, as discussed *infra. See* D.C.Code § 34–604(b) (2001); *D.C. Tel. Answering Serv. Comm. v. Pub. Serv. Comm'n,* 476 A.2d 1113, 1121 (D.C.1984).

In addition to submitting its written comments, OPC served a "data request" on Verizon in the form of seven interrogatories concerning the purpose and impact of the proposed tariff amendment. Among other things, OPC asked Verizon how many home-based businesses currently were classified as business customers and how much business service revenue those customers generated; whether the call volume attributable to home-based businesses differed from that of other businesses; and how Verizon's revenues would be affected if home-based businesses were to take advantage of the tariff amendment and switch to a residential rate.

Responding to OPC's interrogatories, Verizon acknowledged that it did not know how many home-based business customers subscribed to business service or what revenues and call volume they generated. Nor could Verizon estimate how many requests for reclassification of service it might receive if the Commission were to approve its tariff amendment.[3] Verizon proceeded on the admittedly unverified but, it suggested, not unreasonable assumptions that most home-based businesses are "very small, both in terms of revenue and call volumes," and that customers who would choose residential telephone service to meet the needs of a home-based business would display calling patterns comparable to those of other residential customers.[4] In support of its claim

that customers with significant business call volume would not switch to residence service if the tariff change were approved, Verizon pointed out that such customers would continue to have to purchase business service in order to be listed in the business section of the White Pages.

After considering OPC's comments, Verizon's reply, and Verizon's interrogatory responses, the Public Service Commission issued an order and a notice of final rulemaking in which it granted Verizon's application to amend its tariff. The Commission rejected OPC's argument that charging home-based businesses lower rates for telephone service would discriminate unjustly against non-home-based businesses on the grounds that "a home-based business customer would only be able to receive residential rates when the use of the service is primarily domestic in nature and the location of the service is at a residence, while a business service is primarily business or professional in nature."

OPC asked the Commission to reconsider, arguing that the distinction between home-based businesses and non-home-based businesses was not supported by substantial evidence in the record. OPC emphasized that Verizon presented the Commission with no hard data—only unverified assumptions—concerning the volume of telephone calls or the revenues that home-based businesses generate compared

---

**3.** Verizon also could not estimate how monthly telephone bills and corresponding revenues would be affected by service changes following such approval. Verizon thought it "likely" that home-based business customers who switched to residential service would see a "nominal" decrease in their monthly telephone bills, but it could not quantify the change. Verizon did not consider it "an efficient use of resources" to attempt to identify home-based business customers in order to "force them to either switch to a business service classification or purchase an addition-

al line, at business rates, for any greater-than-incidental business use."

**4.** Verizon defended its assumption by arguing that in general, a home-based business would be "limited in size due to District zoning and licensing requirements, as well as any more localized restrictions such as those in property rental agreements and home owners association covenants, and limitations resulting from historic preservation efforts, civic associations, or neighborhood watch programs."

to other businesses. Given the absence of such data, OPC also argued that the record did not support the Commission's conclusion that the primary use of telephone service furnished to home-based business customers at residential rates under the tariff change would remain domestic in nature. In effect, OPC contended, "the Commission simply stated a conclusion (that there is a distinction between home-based businesses and non-home-based businesses) without explaining how it reached that decision, other than to cite its reliance upon Verizon's tariff."

Unpersuaded, the Commission reaffirmed its approval of Verizon's tariff amendment. The Commission explained that it was not deterred by the absence of call volume data in the record before it. The Commission was prepared to "agree with OPC that monitoring a residential customer's calling patterns could render a more conclusive determination that the primary use of a particular residential line is either domestic or business in nature." However, the Commission said, the correlation between high volume and nature of use is inexact:

> Call volume may serve as an indicator, but it would not, in and of itself, determine whether a call is domestic or business in nature. A home-based business at a residence with high call volume would not necessarily indicate that the calls are not primarily domestic in nature. Conversely, a non-home-based business with a small volume of calls does not mean that the calls are not primarily business in nature.

The Commission also concluded that requiring Verizon to collect call volume data would not be cost-efficient:

> Aside from invasion of privacy concerns, a call volume review requirement could necessitate a significant expenditure of resources by Verizon DC, which might,

in turn, impose additional costs on customers. This expenditure of resources is unjustified, *particularly since Verizon DC estimated that the number of home-based business customers that would benefit from this rate change would be small.* Accordingly, Verizon DC's estimation that home-based businesses primarily use their telephone service·for residential purposes is a more reasonable and cost-efficient way to determine rate categorization for business or residential purposes than·OPC's proposal to track home-based business calls.

(Emphasis added; record citations omitted.)

The Commission then identified three factors that justified distinguishing home-based business customers eligible for residential service from non-home-based business customers. The first two factors—residential location and primarily domestic use of the service, the two conditions that a home-based business customer must meet under the amended tariff to qualify for residential rates-echoed what the Commission said in its initial order. A significant third factor, the Commission added, is that "home-based business customers receiving residential rates may not be listed in the business *or yellow pages,* unlike non home-based businesses." (Emphasis added.) Based on these considerations, the Commission rejected Verizon's claim that its order failed the "substantial evidence test."

It is undisputed that the Commission misread Verizon's data responses in two respects and consequently misstated the facts of record on which it relied. First, contrary to the Commission's statement explaining why the collection of call volume data would not be cost-efficient, Verizon did *not* estimate that only a small number of home-based business customers would

benefit from the proposed rate change.[5] Second, contrary to the Commission's statement that customers receiving residential rates may not be listed "in the business or yellow pages," and as Verizon has acknowledged on appeal, any customer regardless of status may advertise as a business in the Yellow Pages.[6]

## II.

Characterizing the proceeding before the Commission as a "contested case," see D.C.Code §§ 2–502(8) and 2–509 (2001), OPC argues on appeal that the Commission lacked substantial evidence to support its conclusion that the tariff amendment would not discriminate unlawfully against non-home-based business customers. Most specifically, OPC argues that the Commission lacked necessary call volume data showing whether it is less costly for Verizon to serve home-based business customers than other business customers. Additionally, OPC argues, the Commission relied on erroneous findings of fact that had no support in the record.

In response, the Commission and Verizon deny that the tariff amendment proceeding was subject to a "substantial evidence" requirement. The proceeding was not a "contested case," they argue, but rather was an exercise in rulemaking (or, as the Commission phrases it, "policy making") that rests on a reasonable distinction between eligible home-based businesses and other businesses. The Commission

and Verizon further argue that, in any event, the Commission's findings of fact were supported by substantial evidence.

## A.

▇ The first issue we must resolve is whether the Public Service Commission decision in this case is subject to a substantial evidence test on judicial review. We hold that it is.

▇ Appeals to this court of Public Service Commission orders are governed by D.C.Code §§ 34–605 and 34–606 (2001). Section 34–605 spells out appellate procedures and § 34–606 describes the scope of review. That scope is narrow. Section 34–606 provides that "[i]n the determination of any appeal from an order or decision of the Commission the review by the Court *shall be limited* to questions of law, including constitutional questions; and the findings of fact by the Commission *shall be conclusive* unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." (Emphasis added.) The companion provision, § 34–605(a), adds that this court "may require and direct the Commission to receive additional evidence upon any subject related to the issues on said appeal ... upon which the record may contain no *substantial evidence*."[7] (Emphasis added.) As used in the context of judicial review of administrative agency decisions, the term "[s]ubstantial evidence means more than a mere

---

5. The Commission misconstrued an interrogatory answer that merely tendered Verizon's "assumption that most home-based businesses are very small, both in terms of revenue and call volumes, and use their residential phones for any business needs related to their home-based businesses."

6. The Commission misconstrued a Verizon interrogatory answer which stated only that a customer would have to purchase business service in order to be listed in the business

section of the White Pages. The interrogatory answer said nothing about listings in the Yellow Pages.

7. *Cf.* D.C.Code § 2–510(a)(3)(E) (recognizing power of reviewing court under the District of Columbia Administrative Procedure Act to hold unlawful and set aside agency action, findings or conclusions found to be "[u]nsupported by substantial evidence in the record of the proceedings before the Court").

scintilla and such that reasonable minds might accept it as adequate to support a conclusion." *Clark v. Dist. of Columbia Dep't of Employment Servs.*, 743 A.2d 722, 726 (D.C.2000) (internal quotation marks and citations omitted). We readily may conclude that findings of fact are "unreasonable, arbitrary, or capricious" within the meaning of § 34–606 if they are not based on evidence that a reasonable mind would accept as adequate. Thus, decisions of this court confirm that regardless of the issue or the type of proceeding, when the Commission makes factual findings based on the record before it,[8] review in this court extends to whether those findings are supported by substantial evidence. *See, e.g., Office of People's Counsel v. Pub. Serv. Comm'n,* 610 A.2d 240, 243 (D.C. 1992) ("This court's review function is normally exhausted when we have determined that the Commission has respected procedural requirements, *has made findings based on substantial evidence,* and has applied the correct legal standards to its substantive deliberations.") (emphasis added; internal quotation marks and citations omitted). *Accord, Watergate East, Inc. v. Dist. of Columbia Pub. Serv. Comm'n,* 662 A.2d 881, 886 (D.C.1995) ("as § 43–906 implies, this court is bound by the Commission's findings of fact *if supported by*

*substantial evidence* ") (emphasis added). Accordingly, however the tariff amendment proceeding before the Commission in this case is characterized,[9] we must evaluate whether the Commission's material factual findings are supported by substantial evidence in the record.

█ If those findings are thus supported, then the substantial evidence test is satisfied so long as the Commission fully and clearly explains its decision and demonstrates "a rational connection between facts found and the choice made." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 661 A.2d 131, 135 (D.C.1995) (internal quotation marks and citations omitted). In evaluating the Commission's rationale, we bear in mind that "[i]t is especially important to accord great respect to the Commission in a complex, esoteric area such as ratemaking in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies." *Office of People's Counsel,* 610 A.2d at 243 (internal quotation marks and citation omitted). "Because theories of ratemaking in particular fall within the special province of the PSC, such theories are not subject to the same substantiation

---

8. In appropriate circumstances, and subject to procedural safeguards, an administrative agency may take "official notice of a material fact not appearing in the evidence in the record." D.C.Code § 2–509(b). As the Commission did not purport to find facts via official notice in the present case, we address no further the standards governing our review of such action.

9. With no objection from OPC, the Commission treated Verizon's application for a tariff amendment as a matter of rule making rather than an adjudication. OPC did not call for a formal evidentiary hearing on its complaint that the amendment is unreasonable and unjustly discriminatory, as it could have done. See D.C.Code §§ 34–908 to 34–910 (2001);

*Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n,* 378 A.2d 1085, 1091 (D.C.1977) (holding that where public utility proposes a new service, statute [now D.C.Code § 34–908] "requires a formal hearing only when the Commission proceeds upon its own initiative, or a reasonable complaint is made ... on the basis that a rate, schedule or service appears unreasonable or unjustly discriminatory"). OPC does not challenge the Commission's failure to hold a formal evidentiary hearing in this case. We note, however, that a formal hearing is unnecessary when there is not a dispute over material facts, and the only disputes concern inferences to be drawn or issues of policy or law. *See Watergate East, Inc.,* 662 A.2d at 890.

principle applicable to fact-finding." *Id.* (internal quotation marks and citations omitted). We appreciate that Commission decisions may be based on regulatory policy choices as much as on purely factual determinations, and that the Commission "may modify policy choices so long as it explains the basis for the change." *Washington Gas Light Co. v. Pub. Serv. Comm'n,* 483 A.2d 1164, 1169 (D.C.1984) (internal quotation marks and citation omitted). Questions of regulatory policy, as distinct from questions of law, "are beyond both the jurisdiction and the competence of a reviewing court." *Washington Metro. Area Transit Auth. v. Pub. Serv. Comm'n,* 486 A.2d 682, 692 (D.C. 1984).

### B.

■ Turning to OPC's challenge to the tariff amendment as unjustly discriminatory, the issue we must resolve is whether to overturn the Commission's decision for lack of support by substantial evidence in the record. "In light of the Commission's expertise, its rate orders are presumptively valid, and the petitioner challenging an order carries the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *Potomac Elec. Power Co.,* 661 A.2d at 135 (internal quotation marks and citations omitted). In this instance, we are not persuaded by OPC's contention that the Commission's decision is doomed by the absence of empirical call volume data or by any fundamental inadequacy in the factors on which the Commission relied to distinguish eligible home-based business customers from non-home-based business customers of Verizon. We do conclude, however, that the Commission's decision is flawed to the extent that it relies on two specific factual misstatements that lack evidentiary support in the record.

■ The Commission's duty to require that utility charges be nondiscriminatory, *see* D.C.Code §§ 1–204.93, 34–911 (2001), "is deliberately broad and gives the Commission authority to formulate its own standards and to exercise its ratemaking function free from judicial interference, provided the rates fall within a zone of reasonableness which assures that the Commission is safeguarding the public interest—that is, the interests of both investors and consumers." *Metro. Washington Bd. of Trade v. Pub. Serv. Comm'n,* 432 A.2d 343, 350 (D.C.1981) (citation omitted). The basic reasonableness inquiry is simply "whether customers have paid different amounts for the same service under the same circumstances." *Atl. Tel. Co. v. Pub. Serv. Comm'n,* 390 A.2d 439, 444 (D.C. 1978). We have afforded the Commission wide latitude in designing different customer classes for the purpose of assigning different rates. In particular, "[w]e have never imposed a requirement of uniformity among the rates of return from different customer classes; differences have indeed traditionally been tolerated." *Washington Gas Light Co. v. Pub. Serv. Comm'n,* 450 A.2d 1187, 1207 (D.C.1982); *accord, Apartment House Council of Metro. Washington, Inc. v. Pub. Serv. Comm'n,* 332 A.2d 53, 57 (D.C.1975) ("equal return from customer classes is not required"). The Commission is permitted to consider a range of factors in addition to the cost of service to each class. *Washington Gas Light Co.,* 450 A.2d at 1199 ("the permissibility of relying on non-cost factors in rate design is beyond serious dispute"). "Differences can be based not only on quantity, but also on the nature, time, and pattern of use so as to achieve reasonable efficiency and economic operation." *Apartment House Council of Metro. Washington, Inc.,* 332 A.2d at 57. The question of unjust discrimination in customer classification is not, therefore, a mere question of fact.

The selection of classification criteria is, in large measure, a question of regulatory policy committed to the informed discretion of the Commission.

In exercising that discretion in this case, the Commission explained that it dispensed with empirical data on the volume of telephone usage attributable to home-based businesses because such data was not readily available, would be expensive and invasive of customer privacy to obtain, and would be inconclusive in any event. OPC has not shown that this explanation was unreasonable, it did not proffer such empirical data itself, and the substantial evidence rule imposed no affirmative duty on the Commission to collect such information.

■ We are not persuaded by OPC's contention that, without call volume data or comparable "hard" evidence, the Commission's customer distinction in this case cannot stand. The Commission sought to draw a reasonable and practical line to distinguish residential rate customers from business rate customers, taking into account the reality of mixed usage, i.e., the use of home telephones for business as well as non-business purposes. It is impractical, if not impossible, to measure the breakdown of such usage exactly and charge each customer accordingly. The Commission embraced the principle that in mixed use cases, the rate to be charged properly may depend on which use predominates. Given the validity of the basic distinction between residential and business rates, which OPC has not challenged, the "predominant use" principle that the Commission followed is reasonable and not unjustly discriminatory. (It is not suggested that the Commission was obligated to devise a third rate category.) OPC objects to the "predominant use" principle on the ground that substantial but not predominant business use of a home tele-phone may generate call volumes and impose service costs equal to the call volumes and service costs associated with some non-home-based businesses. The same can be said, however, about substantial domestic use. In any event, the Commission is not obliged to equalize the returns from different customer classes, and it may classify customers on the basis of factors other than cost of service, including the nature of their use of the service. Moreover, it is not unreasonable for the Commission to suppose that predominantly domestic use does correlate, at least roughly, with lower volume of use. Perfect exactitude in drawing the line of demarcation between different customer classes is not demanded. "[T]he need to draw a line does not convert an otherwise reasonable classification into an arbitrary classification." *Metro. Washington Bd. of Trade,* 432 A.2d at 361.

To effectuate the "predominant use" principle, the Commission identified three criteria for mixed use customers to satisfy in order to be eligible for residential rather than business rates: residential location, primarily domestic use (as reported by the customer), and residential rather than business directory listing of the service. These are perhaps imperfect but nonetheless reasonable criteria to utilize in order to achieve the valid and nondiscriminatory goal of making residential rates available to customers who use their telephones mainly for residential purposes, and not to customers who use their telephones mainly for business purposes.

It is certainly true that the Commission could have followed a different classification principle. The Commission could have eschewed the residential/business distinction altogether and tied the rate for telephone service strictly to the customer's call volume level. Or the Commission could have adhered to the principle, em-

bodied in Verizon's tariff prior to its amendment and promoted by OPC, that the business rate will be charged whenever business use is more than "merely incidental." Each of these alternatives may have its own problems, of course; the term "merely incidental," for instance, is susceptible to a range of interpretation. More importantly, however, the mere existence of acceptable alternatives does not invalidate the Commission's choice.

OPC argues that the record before the Commission contains no evidence establishing that home-based business customers in fact use their telephones for primarily domestic purposes. OPC's practical and not unreasonable concern is that such customers might opt for service at residential rates even if their business use exceeds their domestic use. But this concern does not mean that the Commission's criteria are discriminatory, only that those criteria may be difficult to enforce because Verizon has no way to determine the actual breakdown of any given customer's telephone use. The "merely incidental business use" requirement that OPC would have the Commission retain is, for this same reason, equally, if not more, difficult to enforce. There is a safeguard, however, that would operate to discourage widespread evasion of the amended tariff requirements: the more substantial the business use, the more likely the customer is to desire a business listing in the White Pages. The customer must pay the business rate to obtain that listing.

Defensible as we find the Commission's decision to be overall, we do agree with OPC that the Commission misread Verizon's data responses and consequently made two factual findings that are unsupported by substantial evidence. First, the Commission mistakenly stated that Verizon estimated that only a small number of home-based business customers would benefit from the tariff amendment. Second, the Commission mistakenly stated that home-based business customers receiving residential rates could not be listed in the Yellow Pages.

When the Commission demonstrably misreads the record before it and, in consequence, makes factual misstatements on which it expressly relies in reaching its decision, we cannot conclude easily that the Commission reasonably could, or would, have reached the same result had it not so erred—particularly when, as here, the Commission does not even argue that its factual errors were immaterial. In the present case, we therefore think that the prudent course is to vacate the order on appeal and remand to the Commission for reconsideration of its decision in light of the defects that we have identified.

*So ordered.*